IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carrie Amstutz,                                          Case No. 3:13CV2385

    Plaintiff,

    v.                                               **ORDER**

Liberty Center Board of Education,

    Defendant.

This is an employment discrimination case under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, Ohio's age discrimination statute, O.R.C. § 4112.14, Ohio's workers' compensation statute, O.R.C. § 4123.90, and the procedural due process requirements of 42 U.S.C. § 1983. I have jurisdiction under 28 U.S.C. § 1331.

Plaintiff Carrie Amstutz alleges Defendant Liberty Center Board of Education (Liberty Center, or the Board) fired her because of her age, and for exercising her rights under the FMLA and O.R.C. § 4123.90. Pending is Liberty Center's motion for summary judgment. (Doc. 24). For the following reasons, I grant the motion.

**Background**

Amstutz worked for Liberty Center as a school bus driver and cafeteria aid from August 24, 1998 until May 3, 2013. (Doc. 1 ¶ 2).

During the period relevant to this dispute, Amstutz drove a bus on weekdays between 6:30 and 8:00 a.m. and 2:40 and 4:00 p.m. (Doc. 23-1 at 16). Her daily duties as a driver included inspecting her bus, keeping it clean, driving students to and from school and monitoring their behavior. (*Id.* at 15).

As a cafeteria aide, Amstutz worked between 10:00 a.m. and 2:00 p.m. each weekday. (*Id.* at 18). Her duties in the cafeteria included washing dishes, preparing and serving food and cleaning tables. (*Id.* at 11).

Between 2007 and 2011, Amstutz's bus and cafeteria supervisors gave her generally positive performance reviews. (Docs. 24-1 through 24-6). The reviews did, however, note areas needing improvement. (*Id.*). Specifically, Amstutz received feedback regarding her attendance, punctuality, behavior toward fellow employees, and willingness to help with tasks not individually assigned to her. (*Id.*).

As time wore on, Amstutz began to have disciplinary problems. Once, in 2011, supervisors called Amstutz and other cafeteria aides to a meeting to discuss the "unhealthy and hostile work environment" in the cafeteria and kitchen. (Doc. 24-7). A follow-up letter warned, "[f]rom this point on, any comments, accusations, or personal insults, will be viewed as an act of insubordination" from which "[a]ppropriate disciplinary actions will result." (*Id.*).

Amstutz's discipline problems worsened in 2013.

On January 4 of that year, Amstutz woke up feeling ill. (Doc. 23-1 at 58). She completed her morning bus route, but afterward, at around 8:20 (about an hour and a half before her cafeteria shift), she called in sick. (*Id.*).

Donna Eickholt, the cafeteria supervisor, issued Amstutz a verbal and written warning. (Doc. 24-10). Eickholt cited school-district policy requiring Amstutz to notify her of an absence as soon as possible so she could arrange a substitute. (*Id.*). Eickholt observed Amstutz had "done this repeatedly in the past, and then returned to the school in the afternoon and driven the school bus." (*Id.*). She cautioned, "[i]f you fail to comply with expectations, more severe discipline action could result, up to and including suspension, or even termination." (*Id.*).

Later in January, Kristi Thompson, superintendent of the school district, reprimanded Amstutz for not having a "positive attitude." (Doc. 24-8). Thompson advised Amstutz, "[t]here will be no toleration of disruption among the staff or unwillingness to be a team player." (*Id.*).

In early February, an Ohio State Highway Patrol inspector cited Amstutz's bus for "having [an] item that does not pertain to the operation of a school bus (photo of grandchild) attached to the front driver area." (Doc. 24-9). Kevin Sonnenberg, the transportation supervisor, instructed Amstutz to remove the photo, and then issued her a verbal and written warning when she failed to do so. (*Id.*). Sonnenberg thought she was "being insubordinate," and warned, "[i]f this continues further action will result, which could include termination."[1] (*Id.*).

Amstutz later received a written reprimand over this incident. (Doc. 24-9). It noted her infractions were "neglect of duties" and "insubordination." (*Id.*). It stated she had "admitted to being negligent," and cautioned if she did not "correct [her] actions," she would be "subject to further disciplinary action up to and including termination." (*Id.*).

---

[1] Amstutz initially filed a grievance about this warning, but withdrew it following her March suspension, *see infra*. (Doc. 24-9).

Toward the end of February, Amstutz asked to use sick leave to take off the week of Monday, February 25 for her grandson's birth. (Doc. 23-1 at 63). Eickholt permitted the leave, but explained under the school district's collective bargaining agreement (CBA) (Doc. 24-24 Ex. 2), Amstutz could use only one sick day and would have to use personal days for the rest of the week. (Doc. 23-1 at 63-64).

When February 25 arrived, Amstutz called in sick with bronchitis. She said her illness would keep her out of work for the week. (*Id.*). She later told her supervisors she was bedridden and dependent on a breathing machine the entire week she was absent. (Doc. 24-24 ¶ 5).

On March 5, after Amstutz returned to work, she filled out a sick leave form. (Doc. 24-12). On it, she explained she had "acute bronchitis, fever [and an] ear infection." She attached a doctor's note excusing her from work because of "illness." (*Id.*). The note provided no further detail. (*Id.*).

The sick leave form included a section where Amstutz could have requested FMLA leave.[2] (*Id.*). The form explained an employee may qualify for FMLA leave for "[t]hree or more days for the same illness/cause other than things like flu, cold, etc. Days may be nonconsecutive. See the principal or assistant treasurer for questions." (*Id.*). She did not request FMLA leave, which is unpaid. (*Id.*). She requested regular, paid sick leave instead. (*Id.*).

Thompson was displeased Amstutz gave such short notice of her absence. (Doc. 24-24 ¶ 6). Thompson also considered the timing of Amstutz's illness – given her prior request to take time off that week for personal reasons – to be "too coincidental" not to arouse suspicion (*Id.* ¶ 4). So, she reviewed Liberty Center security camera footage from that week, and found what she

---

[2] Amstutz had used FMLA leave on three prior occasions while working for Liberty Center. (Doc. 23-1 at 116-22).

4

believed to be video of Amstutz picking up her granddaughter at school. (*Id.* ¶ 5). That footage, Thompson concluded, confirmed Amstutz was lying about why she was absent. (*Id.*).

Consequently, on March 7, Thompson sent Amstutz a letter formally reprimanding her and suspending her without pay for three days. (Doc. 24-11). It stated:

> In has been noted in your file that you have a long and extensive history of absenteeism. Records dating back to 2007 indicate repeated counseling regarding the district expectation of improving your attendance. The series of attendance issues leading up to the most current absence is unacceptable as it is a major disruption to the operations of the school district. Your average missed days is 32.8 days per year. Coming to work on a regular basis is a reasonable expectation; we believe the gravity of this offense warrants an unpaid suspension. . . .
>
> If you fail to comply with expectations, more severe discipline action could result, up to and including suspension, or even termination.

(*Id.*).

Amstutz did not grieve her suspension because "[she] didn't want to go through with it, because [she] was tired of all the problems and [she] just wanted to let go." (Doc. 23-10 at 62).

A month after the suspension, Amstutz had yet another disciplinary problem.

Amstutz had, since the beginning of February, known she was not to use commercial-grade cleaner in the cafeteria while students were eating. (Doc. 23-1 at 82, 88; Doc. 24-23 ¶¶ 10-16; Doc. 24-24 ¶ 9; Doc. 24-25; Doc. 24-26). On April 19, Eickholt emailed Thompson, complaining she was having "an insubordination issue with [Amstutz]. She was spraying chemicals on tables while kids are still in the lunchroom eating. I've addressed it verbally before

5

with her and [a co-worker] and she did it again yesterday. What step of discipline do I take this to?"³ (Doc. 24-13).

On April 22, Thompson called Amstutz to a meeting with Eickholt, Sonnenberg, and Barb Retcher, Amstutz's union representative, to discuss Amstutz's purported insubordination. (Doc. 23-1 at 93-94; Doc. 24-24 ¶ 13). Thompson gave her three options: 1) take a five-day suspension after signing a "Last Chance Agreement" (LCA), 2) resign, or 3) be fired.

Amstutz and Retcher discussed the options privately and Amstutz called her husband. (Doc. 23-1 at 101-02). Amstutz then signed the LCA, agreeing if she "violate[d] any provision of the [LCA], the Board would notify her of the violation, and she would have the option of resigning or being terminated." (*Id.* at 100; Doc. 24-14).

On May 3, while serving her suspension, Amstutz withdrew her agreement to the LCA, declaring she intended to "use all legal resources available to fight this retaliatory action by school officials and the [union] that I deem necessary. THIS IS AMERICA NOT NAZI GERMANY and I believe my civil rights have been violated." (Doc. 24-15) (capitalization in original).

Later that day, Thompson fired Amstutz "due to repeated insubordination." (Doc. 24-16).

On May 9, the Board made Amstutz's termination official. (Doc. 24-16). It notified her it did so for "insubordination, misfeasance, dishonesty, and for good and just cause." (*Id.*). It elaborated:

> The specific grounds for your termination constitute "just cause" for your termination. These grounds included your failure to comply with a directive to not use chemical sprays around students in the cafeteria while they are eating. You have repeatedly done

---

³ To support its motion, Liberty Center submitted DVD footage purporting to show Amstutz cleaning tables with commercial-grade cleaner while students were eating and drinking nearby. (Doc. 24 Ex. 24).

6

> this despite directives to cease, and you lied about using the chemicals when confronted. You have prior discipline in your file as allowed by the CBA Article 7(B) that shows progressive discipline, including a prior suspension without pay and discipline related to multiple instances of insubordination. Your behavior could no longer be tolerated by the Board of Education.

(*Id.*).

Amstutz filed a grievance, arguing, *inter alia*, she had not been insubordinate. (Doc. 24-17). Liberty Center held a hearing and denied the grievance. (*Id.*). The Ohio Association of Public School Employees also denied the grievance "based on its merits." (Doc. 24-18).

Amstutz then filed a charge of employment discrimination with the Ohio Civil Rights Commission (Doc. 24-19), which the Commission dismissed. (Doc. 24-20). Amstutz also applied to the Ohio Department of Job and Family Services for unemployment compensation, which the Department denied because the Board had discharged her for "just cause." (Doc. 24-21).

Shortly thereafter, Amstutz initiated this action. (Doc. 1). She seeks an injunction reinstating her to her position with the school district; back wages; compensatory, liquidated and punitive damages; interest; and her costs and attorney fees. (*Id.*).

**Standard of Review**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the

[unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

Amstutz alleges Liberty Center violated her rights under: 1) the FMLA, 2) Ohio's age discrimination statute, and 3) Ohio's workers' compensation statute; and by 4) depriving her of procedural due process. (Doc. 1 ¶¶ 5-25).

### A. FMLA

Amstutz contends Liberty Center violated the FMLA by suspending and, eventually, firing her for taking FMLA leave. (Doc. 1 ¶¶ 8-16).

Congress enacted the FMLA to provide leave for workers whose personal or medical circumstances require leave exceeding what their employer is willing or able to provide. *See* 29 C.F.R. § 825.101. Employees who take leave under the statute are entitled to return to the same or equivalent position and benefits they had previously. *See* 29 C.F.R. § 825.100. An employer who denies an employee these entitlements violates the FMLA. *See* 29 U.S.C. §§ 2614(a)(1), 2615(a); 29 C.F.R. § 825.100(c).

To analyze an FMLA discrimination claim, I apply the burden-shifting framework established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

First, Amstutz must make her prima facie case. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283-85 (6th Cir. 2012). The burden then shifts to Liberty Center to present legitimate, nondiscriminatory reasons for suspending and, eventually, terminating her. *See id.* If

Liberty Center carries that burden, Amstutz must show Liberty Center's reasons are pretext for unlawful discrimination. *See id.*

To establish her prima facie case, Amstutz must show: "1) [she] was engaged in statutorily protected activity; 2) [Liberty Center] knew that [she] was exercising [her] FMLA rights; 3) [she] suffered an adverse employment action; and 4) a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Amstutz has not met her burden.

As a threshold matter, it is debatable whether Amstutz suffered from a FMLA-qualifying condition. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007) (employee seeking FMLA leave for medical reasons must have "serious health condition" as defined by the statute).

Many courts have held, as a matter of law, bronchitis is not a "serious health condition" under the FMLA absent "extraordinary circumstances." *Schaub v. Fulton Precision Indus.*, 2005 WL 1154421, *4 (M.D. Pa. 2005); *see, e.g.*, *Dalton v. Manorcare of West Des Moines*, 782 F.3d 955, 961 (8th Cir. 2015) (bronchitis a "short-term condition" Congress did not intend FMLA to cover); *Beal v. Rubbermaid Commercial Prods. Inc.*, 972 F. Supp. 1216, 1225 (S.D. Iowa 1997) (bronchitis not FMLA-qualifying condition where employee "still able to meet her family needs").

That said, Amstutz's alleged week-long need for a breathing machine may have elevated her bronchitis to FMLA-qualifying status. *See Kauffman v. Fed. Express*, 426 F.3d 880, 886-87 (7th Cir. 2005) (bronchitis requiring continuing treatment sufficient); *Hovind v. Bristol Place*

9

*Corp.*, 2008 WL 4717476, *4 (D. Minn.) (bronchitis may suffice depending on "specific details of the employee's condition and treatment").

In any event, whether Amstutz's illness was FMLA-qualifying or not, she cannot prove Liberty Center knew she was exercising her FMLA rights. *See Killian*, 454 F.3d at 556.

In *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236 (9th Cir. 2014) (R. Gilman, J., sitting by designation), the Ninth Circuit considered whether an employee affirmatively can decline to use FMLA leave, even where, as may be the case here, the reason for leave would have triggered FMLA protection.[4]

There, plaintiff requested paid vacation time to care for her sick father (a scenario within the FMLA). *Id.* at 1241. Her employer did not instruct her about her FMLA rights or take steps to designate the leave as FMLA leave. *Id.* But plaintiff had taken FMLA leave many times before, and therefore had "knowledge of FMLA leave and how to invoke it." *Id.* at 1242. Upon returning from her leave – which she extended without notifying her employer – she lost her job. *Id.* at 1241.

Plaintiff filed an FMLA interference claim. *Id.* at 1242. The district court denied both parties' motions for summary judgment because there were genuine issues of material fact about whether plaintiff had declined FMLA protection during conversations in which no one mentioned the FMLA. *Id.* The jury returned a verdict for the employer, and plaintiff appealed. *Id.*

On appeal, the circuit court affirmed. *Id.* at 1244. It held:

> An employer's obligation to ascertain "whether FMLA leave is being sought" strongly suggests that there are circumstances in which an employee might seek time off but intends not to exercise his or her rights under the FMLA. And a compelling practical reason supports this conclusion. Holding that simply referencing

---

[4] The Sixth Circuit has not ruled on this issue. I note, however, a Sixth Circuit judge, sitting by designation, authored the *Escriba* opinion.

10

> an FMLA-qualifying reason triggers FMLA protection would place employers . . . in an untenable situation if the employee's stated desire is *not* to take FMLA leave. The employer could find itself open to liability for forcing FMLA leave on the unwilling employee. We thus conclude that an employee can affirmatively decline to use FMLA leave, even if the underlying reason for seeking the leave would have invoked FMLA protection.

*Id.* (citations omitted; emphasis in original); *see also Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 769 n.3 (7th Cir. 2008) ("If an employee does not wish to take FMLA leave but continues to be absent from work, then the employee must have a reason for the absence that is acceptable under the employer's policies, otherwise termination is justified.").

In response to plaintiff's argument "[e]mployees cannot waive, nor may employers induce employees to waive, their rights under the FMLA," *see* 29 C.F.R. § 825.220(d), the court found the relevant regulation only means an employee "cannot trade off" her FMLA rights "against some other benefit offered by the employer as part of a collective bargaining agreement or some other form of negotiation." *Escriba*, 743 F.3d at 1244 (internal quotation marks omitted).

"Waiver is the voluntary relinquishment of a known right. But affirmatively declining the present exercise of a right in order to preserve it for the future is fundamentally different from permanently relinquishing that right." *Id.* (internal quotation marks and citations omitted). Thus, denial of plaintiff's summary judgment motion was appropriate because she "was given the option and prompted to exercise her right to take FMLA leave, but . . . she unequivocally refused to exercise that right. *Id.* at 1244-45 (quoting *Escriba v. Foster Poultry Farms, Inc.*, 2011 WL 4565857, *7 (E.D. Cal.)).

I find the Ninth Circuit's reasoning persuasive.

Like the *Escriba* plaintiff, Amstutz took FMLA leave many times before the absence at issue here.[5] (Doc. 23-1 at 116). There can be no dispute she understood FMLA leave. *Id.*

When she returned from her week-long absence, she filled out a sick leave form (Doc. 24-12) listing criteria for FMLA leave, and expressly offering it to her *if she wanted it*. *See Hudson v. Tyson Fresh Meats, Inc.*, 2015 WL 4742052, *3 (N.D. Iowa) (leave of absence form including checkbox for taking FMLA leave was relevant to whether plaintiff intended to take FMLA or non-FMLA leave). She declined and took paid sick leave instead. (Doc. 24-12).

Once Amstutz declined FMLA leave, Liberty Center was no longer obligated to her under the statute. *See Escriba*, 743 F. 3d at 1244. She cannot now retroactively invoke a right she previously chose not to exercise. *See id.* at 1244-45.

Not knowing Amstutz wanted FMLA leave, Liberty Center cannot be liable either for denying it to her or firing her in retaliation for exercising her FMLA rights. Amstutz's FMLA discrimination claim is therefore not viable.

### B. Age Discrimination

Alternatively, Amstutz argues Liberty Center fired her, at least in part, because of her age. (Doc. 1 ¶¶ 5-7).

Section 4112.14 of the Ohio Revised Code provides no employer shall "discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job."

---

[5] The last of Amstutz's three FMLA leaves was in January 2012, more than a year before she lost her job. The timing of these events is too attenuated to support a reasonable inference of causal connection between her FMLA leaves and her termination. *See Bagby v. Covidien*, 2014 WL 1046056, *14 (S.D. Ohio) (no inference of causation where five months separated FMLA leave and adverse employment action).

12

I analyze O.R.C. § 4112.14 age discrimination claims "under the same standards as federal claims brought under the [Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634]." *Wharton v. Gorman–Rupp Co.,* 309 Fed. Appx. 990, 995 (6th Cir. 2009) (citing *Minadeo v. ICI Paints,* 398 F.3d 751, 763 (6th Cir. 2005)).

The burden of persuasion is on plaintiff to show "age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs, Inc.*, 557 U.S. 167, 177 (2009). Plaintiff "may establish a violation of the ADEA by either direct or circumstantial evidence." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009).

As with Amstutz's FMLA claim, I apply the *McDonnel Douglas* burden-shifting framework to her age discrimination claim. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589-90 (6th Cir. 2014).

To make out her prima facie case for wrongful termination, Amstutz must show: "1) [she] was a member of the protected class, *i.e.*, between 40 and 70; 2) [she] was discharged; 3) [she] was qualified for the position; and 4) [she] was replaced by a younger person." *LaGrant v. Gulf & Western Mfg. Co., Inc.*, 748 F.2d 1087, 1090 (6th Cir. 1984).

Amstutz satisfies her initial burden: 1) she was fifty-five when she lost her job (Doc. 1 ¶ 6); 2) Liberty Center fired her (Doc. 24-16); 3) she had worked for the school district for nearly fifteen years (Doc. 1 ¶ 2) and certainly was qualified for her position; and 4) two younger workers (ages forty-five and twenty-nine) replaced her in the cafeteria the following school year (Doc. 27-1 at 5).

Liberty Center argues Amstutz's claim fails at the next step of the analysis because the Board had legitimate, nondiscriminatory reasons for firing her. (Doc. 24 at 12). I agree.

13

To say Liberty Center had legitimate, nondiscriminatory reasons for firing Amstutz is an understatement. Infractions, warnings and reprimands litter her employment history. Her supervisors threatened her with termination for misconduct no less than six times between 2007 and 2013, when the Board finally fired her.

Amstutz could not persuade a rational jury that Liberty Center's stated reasons for firing her were pretext for discrimination. She admits no one ever said anything to her suggestive of age as a factor in her loss of her job. (Doc. 23-1 at 110). Her only evidence to support that assertion is the school district hired two younger cafeteria aides the following school year.[6] (Doc. 27-1 at 5). That, by itself, may assist her *prima facie* case, but at this stage it is not enough. *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 267 (6th Cir. 1986) ("The isolated fact that a younger person eventually replaces an older person is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination.").

As the Sixth Circuit has held:

> The progression of age is a universal human process. In the very nature of the problem, it is apparent that in the usual case, absent discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in. This factor of progression and replacement is not necessarily involved in cases involving the immutable characteristics of race, sex and national origin. Thus, while the principal thrust of the [ADEA] is to protect the older worker from victimization by arbitrary classification on account of age, we do not believe that Congress intended automatic presumptions to apply whenever a worker is replaced by another of a different age.

*Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1118 (6th Cir. 1980) (quoting *Laugesen v. Anaconda Co.*, 510 F.2d 307, 313 n.4 (6th Cir. 1975)).

---

[6] The school district also hired two *older* bus drivers the following school year. *See Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 897 (6th Cir. 1997) ("[T]he fact that [the employer] replaced two of the four managers he discharged with even older employees contradicts [plaintiff's] claims of discriminatory animus.").

14

Because Liberty Center had legitimate, nondiscriminatory reasons for firing Amstutz that she cannot prove were pretext for age discrimination, her claim fails. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 (6th Cir. 2012) (affirming my grant of summary judgment where plaintiff could not show pretext).

### C. Workers' Compensation

Amstutz also alleges Liberty Center retaliated against her for claiming workers' compensation under O.R.C. § 4123.90. (Doc. 1 ¶¶ 17-22).

As with her other discrimination claims, I apply the *McDonnel Douglas* burden-shifting framework to this claim. *See Marathom Ashland Petroleum v. Williams*, 733 F.3d 182, 187-88 (6th Cir. 2013).

To establish her prima facie case, Amstutz must show: "1) that [she] was injured on the job; 2) that [she] filed a claim for workers' compensation; and 3) that [she] was discharged in contravention of O.R.C. § 4123.90." *Dragmen v. Swagelok,* 2014 WL 6807373, *3 (Ohio Ct. App.).

Amstutz offers no direct evidence of workers' compensation retaliation. Nor could she – her last workers' compensation claim was roughly two and a half years before she lost her job. (Doc. 23-1 at 122). That gap in time is far too long to support an inference of causation. *See Bagby*, 2014 WL 1046056, *14 (discussing time gap between protected act and adverse employment action).

Moreover, as discussed above, Liberty Center had legitimate, nondiscriminatory reasons for firing Amstutz that she cannot prove were pretext for discrimination. *See Blizzard*, 698 F.3d at 287.

Her claim is therefore unavailing.

15

**D. Procedural Due Process**

Finally, Amstutz asserts Liberty Center failed to provide her procedural due process before firing her. (Doc. 1 ¶¶ 23-26).

To evaluate this claim, I first consider whether Amstutz had a property interest in her employment protected by the Due Process Clause. *See Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2013). Property interests do not derive from the Constitution. *Bd. Of Regents v. Roth*, 408 U.S. 564, 577 (1972). "[T]hey are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state-law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

"A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004). In order to have a property interest, a person must have more than "an abstract need or desire for it" or "a unilateral expectation of it." *Roth,* 408 U.S. at 577. "[She] must, instead, have a legitimate claim of entitlement to it." *Id.*

A contract providing an employer may discipline or terminate employees only for "just cause," as the CBA does here, creates a property interest. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538-39 (1985) (holding state statute providing civil service employees could be dismissed only for "misfeasance, malfeasance, or nonfeasance in office" created property interest in continued employment); *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.,* 360 F.3d 583, 587 (6th Cir.2004) (holding CBA providing teacher may be suspended only for "just cause" created property interest in continued pay and benefits).

Thus, the CBA created a property interest in Amstutz's continued employment. She therefore was entitled to "an opportunity of a hearing" before Liberty Center fired her. *Rogers v. 36th Dist. Court*, 529 Fed. App'x 642, 648 (6th Cir. 2013) (employee entitled to oral and written notice of charges and evidence against her, and an opportunity to present her side of the story).

Amstutz had ample opportunity to present her side of the story. She had a pre-termination hearing – the April 22 meeting with her supervisors and union representative – at which she signed the LCA.[7] (Doc. 24-24). Her subsequent rescission of the LCA, which triggered her termination, was a not a separate event requiring another hearing, as she contends. The LCA was part and parcel of the offer Liberty Center made to her at the April 22 meeting so she could keep her job, if that was what she wanted. In effect, she declined that offer.

In light of the above, I find Liberty Center did not deprive Amstutz of due process. *See Rogers*, 529 Fed. App'x at 648.

## Conclusion

Because there is no genuine issue of material fact as to whether Liberty Center violated Amstutz's civil rights, summary judgment is warranted.

It is, therefore

ORDERED THAT Liberty Center's motion for summary judgment (Doc. 24) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[7] Amstutz also had a post-termination grievance procedure to present her case to the school district superintendent, a grievance committee and a mediator. (Docs. 24-17 through 24-19).

17